**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

EKATERINA LOSHKAREVA, individually and on behalf of all others similarly situated,

Plaintiff,

vs.

THE JUICE PRESS LLC, a Delaware limited liability company; JUICE PRESS 34TH STREET, LLC, a New York limited liability company; and DOES 1 through 10, inclusive,

Defendants.

Case No. 1:26-cv-03857-AT

**FIRST AMENDED CLASS ACTION COMPLAINT FOR (1) USE OF A TRAP AND TRACE DEVICE IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CAL. PENAL CODE § 638.51); (2) INTRUSION UPON SECLUSION**

## INTRODUCTION

1. Plaintiff, on her behalf and on behalf of a class of similarly situated persons brings this action against Defendants The Juice Press LLC and Juice Press 34th Street, LLC (jointly "Juice Press" or "Defendants"). Juice Press sells juices, smoothies and plant-based food products to the general public through its website and at retail locations.

2. Juice Press has installed and deployed data broker software on its website – https://juicepress.com/ (the "Website") – to secretly collect data about visitors to the Website, their devices, locations and views of webpages to identify who they are, target them with unwanted marketing and track their internet browsing on an ongoing basis.

3. The data broker software compiles the collected data and correlates it with extensive external records it already has about most Californians in order to learn the identity of Website visitors.

4. Both Juice Press and the data broker behind the software deployed by the Website benefit commercially and financially from this activity. That is because the activities of collecting and transmitting visitor data, as well as identifying specific visitors using that data, are performed with the purpose of targeting visitors for specific marketing, among other things.

5. Juice Press's installation and use of data broker software without obtaining consent or authorization violated California Penal Code § 638.51, California's Trap and Trace Law and duties Juice Press owed to Plaintiff and other visitors to the Website similarly situated under applicable common law.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000 and there are over 100 members of the proposed class. Further, at least one member of the proposed class is a citizen of a State within the United States and at least one defendant is the citizen or subject of a foreign state.

7. This Court has general jurisdiction over Defendant The Juice Press LLC, a Delaware limited liability company, because it is headquartered in New York, New York.

8. This Court has general jurisdiction over Defendant Juice Press 34th Street LLC, a New York limited liability company, because it was formed in New York and is headquartered in New York, New York.

9. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391 because Defendants reside in this District, where both are headquartered and because one of them was formed in New York.

## PARTIES

10. Plaintiff Ekaterina Loshkareva ("Plaintiff") is, and at all times relevant to this complaint has been, a citizen of California. Plaintiff maintains reasonable expectations of privacy when browsing websites.

11. Juice Press owns and operates https://juicepress.com/ (the "Website"). Through the Website, Juice Press sells organic, plant-based drinks and food to the general public.

12. Plaintiff identifies DOE Defendants 1 through 10 as unknown entities that Juice Press directed and controlled to participate in implementing or maintaining Juice Press's deployment of data broker software on the Website. Plaintiff will seek leave to amend this

Complaint to identify these entities when Juice Press's discovery responses reveal their true names and roles.

13. Each DOE Juice Press acted as Juice Press's agent or employee in Juice Press's implementation of the surveillance scheme described herein. Each DOE Defendant operated within the scope of its relationship with Juice Press and participated with Juice Press in the common plan to unlawfully track California residents for Juice Press's commercial gain.

## FACTUAL ALLEGATIONS

14. Juice Press owns, operates, and markets its products on, the Website.

15. On July 17, 2025, Plaintiff visited the Website. When she did, data that reasonably likely identified her were transmitted to at least one third party who used and profited from that data, along with Juice Press: NextRoll, Inc. ("NextRoll"). This occurred through the operation of software and code on the Website.

### Juice Press Shares Visitors' Data with NextRoll, a California Registered Data Broker

16. Juice Press has partnered with at least one California data broker, NextRoll, in order to deanonymize and develop clandestine user profiles on otherwise anonymous website visitors. Juice Press has done this by installing code and tools proprietary to NextRoll on the Website.

17. The NextRoll code deployed on the Website is designed to identify visitors by capturing electronic impulses transmitted from the devices of visitors to a website on which it is deployed. The process initiated by the NextRoll code identifies visitors through a process called "browser fingerprinting." Fingerprinting allows data brokers like NextRoll to ascertain the identity of a website visitor by plotting hundreds of personal identifiers, including a user's geolocation, device information, identification and cross-referencing of malicious cookies installed on their devices, and other traits evident from a user's browser.

### Browser Fingerprinting

18. Why does it matter that data about a Website visitor such as the size of her screen, her device's brand name and her browser settings are transmitted to NextRoll? One would think that the sharing of such seemingly non-personal data cannot impact a visitor's life or experience. This would be an erroneous assumption.

19. The fact is that when you visit a website, ***typically before you get to weigh in on whether you should be targeted with ads or identified***, hundreds of non-personal data points tell data brokers and social media companies who you are, or at the very least stop this relatively brief process. (These data points are *usually* accompanied by information such as the webpage you were viewing immediately prior to arriving at the website, and your city and state.) Data brokers may already have access to your name and email addresses, as well as other websites you have visited in the past, to combine and/or match with this incoming data from your device.

20. Examples of such data points are:

- Device type and configuration
- Browser type and version
- Operating system and version
- Screen resolution and color depth
- System language settings
- Time zone settings
- Installed fonts
- Installed browser plugins or extensions
- Device memory
- CPU class
- Canvas rendering characteristics
- WebGL rendering characteristics
- AudioContext processing characteristics
- Touch support and input capabilities
- Network connection type

21. To be clear, ***website operators*** require some of the data points at issue to render the contents of a page on a website on their visitors' devices. For example, a webpage will only appear properly to a visitor with information about a visitor's device characteristics and configurations, including screen size. What is being discussed here – and what is at issue in this action – is such data being transmitted to ***a third party not involved in operation of the website visited, or the rendering of the website's contents on the screens of visitors.*** Data brokers and social media companies do not need the data to operate any website, or for any purpose other than to identify, target and track website visitors.

22. As explained in an article in the October 2025 issue of *Wired Magazine*:

> Your browser fingerprint is a collection of innocuous information about your PC that, ***when put together, is unique enough that it could identify an individual***. Some of the components of your

> browser fingerprint include your computer's hardware, your browser and version, the various versions of software you have running in your browser, the fonts you have installed on your PC, your time zone, your system language, your keyboard layout; the list goes on. Out of the dozens of pieces of information, none of them could identify you individually. It's when this data is bundled together that your fingerprint becomes unique.[1]

23. The fingerprinting process works even when a visitor does not enter any items *colloquially referred to* as "personal data" – such as name, telephone number, address or email address – into a website.[2]

24. In 2025, researchers at U.S. universities found evidence of the use of browser fingerprinting by websites, particularly in connection with advertising.[3] Through research, Dr. Yinzhi Cao, Associate Professor of Computer Science and Technical Director of the Information Security Institute at Johns Hopkins University, and other scholars, have "correlate[d] browser fingerprints and ad behaviors, essentially establishing the relationship between web tracking and fingerprinting."[4]

**The Cycle of Third-Party Collection of Consumer Data and**

**Ongoing Tracking of Consumers**

25. Collection of visitor data by entities such as NextRoll – including collection by these entities of unique identifiers that the NextRoll code assigns to visitors to the websites of advertising companies like Juice Press – enables ongoing tracking of website visitors as they visit

---

[1] Jacob Roach, "Here's What Your Browser Is Telling Everyone About You:
Your browser sends a lot of information with each website you visit. That can be used to track you across the internet." (Wired Magazine, Oct. 16, 2025), available at https://www.wired.com/story/what-is-browser-fingerprinting/ (last visited 5/8/2026).

[2] As discussed *infra*, in the privacy context, "personal information" can be used to refer to any information that can assist in identifying a person.

[3] Texas A&M Univ. Dep't of Computer Science and Engineering, "Websites Are Tracking You Via Browser Fingerprinting: New research provides the first evidence of the use of browser fingerprints for online tracking." (Texas A&M Stories June 26, 2025), available at https://stories.tamu.edu/news/2025/06/26/websites-are-tracking-you-via-browser-fingerprinting/ (last visited 5/8/2026).

[4] *Id.*

new websites in the future. At the same time, the tracking of a person's internet browsing going forward provides more opportunities for data collection (and profile building) about an individual. This cycle aids the advertising and/or data monetization efforts of NextRoll and similar organizations. The cycle also benefits companies that partner with third-party data collectors to assist with their targeted advertising.

26. As California Attorney General Rob Bonta explained in a 2022 California Superior Court complaint filed against retailer/website operator Sephora USA, Inc.:

> Consumers are constantly tracked when they go online. Sephora, like many online retailers, allows third-party companies to install tracking software on its website and in its app so that these third parties can monitor consumers as they shop. The third parties track all types of data; in Sephora's case, third parties can track whether a consumer is using a MacBook or a Dell, the brand of eyeliner that a consumer puts in their "shopping cart," and even the precise location of the consumer. Some of these third-party companies create entire profiles of users who visit Sephora's website, which the third parties then use for Sephora's benefit. For example, the third party might provide detailed analytics information about Sephora's customers and provide that to Sephora, or offer Sephora the opportunity to purchase online ads targeting specific consumers [ . . . ]. This data about consumers is frequently kept by companies ***and used for the benefit of other businesses***, without the knowledge or consent of the consumer.

Complaint, *People of the State of California v. Sephora USA, Inc.*, CGC-22-601380, 2022 CA Sup. Ct. Pleadings LEXIS 38450 (Cal. Super. Ct., San Francisco Co., Aug. 24, 2022) (the "*Sephora* Complaint"), at 2:2-13 (emphasis added).

**Registered California Data Brokers**

27. Registered California data brokers are companies whose core business is to collect, aggregate, analyze, and sell or license personal and non-personal data about individuals and organizations. Data brokers operate largely behind the scenes, often without direct interaction with the individuals whose data they monetize.

28. Registered California data brokers gather information from a wide variety of sources, including by purchasing information from commercial sources like retailers, financial institutions, online marketplaces, subscription services, and loyalty programs.

29. Once the data is collected it is consolidated and organized into comprehensive profiles that may include thousands of attributes per individual. The data is then cross-referenced and linked using unique identifiers like device IDs and cookies to unify data about individual users from multiple sources.

30. Data brokers are accumulating data and profiling individuals to an alarming extent. As the CEO of a data broker recently described the extent of their surveillance abilities as to an otherwise anonymous individual:

> "We know who she is, what she watches, what she reads, and who she lives with. [We] also know who she follows on social media, what she buys online and offline, where she buys, when she buys, and more importantly, why she buys. We know that [she] has two children and that her kids drink lots of premium fruit juice. We can see that the price of the SKU she buys has been steadily rising on her local retailer's shelf. We can also see that [her] income has not been keeping pace with inflation."[5]

31. Given the amount of data available by way of California registered data brokers' practices, a company like Juice Press has an incentive to partner with data brokers so that it can learn the identity of visitors to its website in order to target visitors with specific marketing materials using, for example, social media platforms.

32. Here, Juice Press partnered with NextRoll, by installing NextRoll code onto the Website. Juice Press allows NextRoll, and possibly other California registered data brokers and social media companies, to access, use, and monetize the data provided by Juice Press, in ways that remain undisclosed to the public.

**NextRoll Code**

33. NextRoll, Inc. ("NextRoll") is a marketing technology company specializing in retargeting and targeted advertising services. NextRoll appears on the California Data Broker Registry, indicating it trades in the personal data it collects (for example, by assembling audience

---

[5] Lucas Ropek, "Data Broker Brags About Having Highly Detailed Personal Information on Nearly All Internet Users" (Gizmodo.com March 15, 2025), available at https://gizmodo.com/data-broker-brags-about-having-highly-detailed-personal-information-on-nearly-all-internet-users-2000575762 (last visited 2/22/2026).

segments or profiles that are used in advertising). NextRoll's services reach across a vast network of websites and advertising exchanges, and the company openly touts its ability to recognize users across different sites and even across devices for marketing purposes.

34. The NextRoll code on Juice Press's Website is a snippet of JavaScript that website owners embed in their site's HTML, typically in the header. Once installed, a feature of the NextRoll Code called the "AdRoll pixel" tracks essentially every action a visitor takes on the site. NextRoll's own help center describes the AdRoll Pixel as code that "tracks everything your visitors are doing on your site." The NextRoll code functions as follows:

35. First, when a user loads a page, the NextRoll code executes and sends an HTTP request to NextRoll's servers, including various pieces of information about the visitor's session. According to NextRoll's documentation, the NextRoll code collects HTTP header data – this includes the user's IP address, their browser user agent (which reveals browser version and operating system), the referrer URL (i.e. where they came from), and the current page URL. In addition, the NextRoll code captures site-specific data: it attaches an "advertisable ID" and "pixel ID" to identify the website/ad account in NextRoll's system (so NextRoll knows which client's website the data came from). It then records user actions on the page (what NextRoll calls "Site Activity") such as page views, clicks on certain elements, form submissions, items added to cart, and other conversion events.

36. Second, NextRoll then assigns each browser a "User identifier" the first time the AdRoll pixel encounters the browser. This is a persistent cookie stored in the user's browser (often named something like "adroll" or "nextroll" cookie) that allows NextRoll to recognize the same user on subsequent visits or on other websites that also have AdRoll/NextRoll tracking. The NextRoll ID cookie is "persistent" because it enables the tracking of the visitor beyond her visit to the website when the cookie is first installed. If another unrelated website also uses the NextRoll code, that same cookie ID will be recognized and the user's visit to that unrelated website will be captured as well, and associated with their existing profile.

37. Third, NextRoll platform performs "cookie matching," meaning it will compare its own user identifier with identifiers used by other ad platforms in order to broaden the reach of

tracking and ad delivery. For example, if NextRoll's pixel technology finds a user, NextRoll can later synchronize that user's ID with, for example, a Facebook or Google cookie, to continue tracking the user's activity across the internet, storing all of the information collected in a discrete user profile.

38. Plaintiff was subjected to the NextRoll code as described *supra* starting when she requested that the Website load on her device on July 17, 2025. This occurred before Plaintiff would have had any opportunity to read any text on the Website about her data or third-party-data-sharing.

**Troubling Implications of Third-Party Data Sharing**

39. Companies using third-party tracking software – such as the NextRoll code described above – often downplay its significance. They emphasize that the data collected by such software is being used simply to inform consumers about products they believe would appeal specifically to them. However, there is no guarantee that consumer data supplied to data brokers or social media platforms will be used solely for advertising purposes.

40. As Attorney General Bonta explained in the *Sephora* case:

> The ramifications of this third-party surveillance can go beyond ordinary consumer profiling. Sephora's website allows visitors to browse and purchase products such as prenatal and menopause support vitamins—data points which can be used by third-party companies to infer conclusions about women's health conditions, like pregnancy. Moreover, when a company like Sephora utilizes third-party tracking technology without alerting consumers and giving them the opportunity to control their data, they deprive consumers of the ability to limit the proliferation of their data on the web.

*Sephora* Complaint, at 2:14-20.

41. Once visitor-identifying data are linked to a broker-maintained identity profile, the data becomes portable: it can be sold, licensed, queried, or otherwise disclosed to a wide range of third parties and repurposed outside the context of the web site visit or visits that generated it.

42. As a data broker, NextRoll can use data it received regarding Plaintiff's visit to the Website to further profile Plaintiff, with the objective of monetizing the data by selling or licensing

it to other entities, including law enforcement and government agencies. The same can be said of data it received regarding visits of members of the putative Class in this action.

43. A recent report by the Brennan Center, a public policy nonprofit, has explained that

> Among the main purveyors in this surveillance capitalism ecosystem are data brokers—companies that collect, assemble, and analyze personal information to create detailed profiles of individuals, which they then sell. . . . Myriad entities buy this information. For example, financial institutions and insurance firms use data for identity verification and risk assessments. Advertising companies use data to offer more relevant and targeted advertisements. More troublingly, data brokers have sold personal information to predatory loan companies, stalkers, and scammers, as well as to political consultants . . . that can use data to send voters disinformation and attempt to skew electoral outcomes. Data brokers also sell data to foreign actors whose uses of the information are not constrained by U.S. law. And . . . law enforcement and other government agencies (including state and local law enforcement, the FBI, the IRS, the Drug Enforcement Administration, the Department of Defense, and the Department of Homeland Security) have secretly been paying data brokers to access vast databases of personal information, including geolocation data, without any warrant, court order, or even subpoena.[6]

44. There are recent examples of tech companies exchanging information with the federal government in ways that threaten civil liberties and individuals with minority viewpoints. For example, U.S. Immigration and Customs Enforcement (ICE) has partnered with Palantir Technologies, a Denver-based software company, to use artificial intelligence and data mining to identify, track, and deport suspected noncitizens.[7]

---

[6] https://www.brennancenter.org/our-work/research-reports/closing-data-broker-loophole (last visited 5/8/2026)

[7] https://www.americanimmigrationcouncil.org/blog/ice-immigrationos-palantir-ai-track-immigrants/ (last visited 5/8/2026).

45. Another example of such government data exchange is the provision by Meta, pursuant to valid warrants, of user data such as Facebook messages, for the purpose of investigating and prosecuting state crimes related to abortion.[8]

46. In February 2026, Google handed over user data to the United States Department of Homeland Security ("DHS" or "Homeland Security") based on an administrative subpoena for the investigation of an individual based on the fact that he had written to a DHS attorney advocating on behalf of a refugee from Afghanistan in deportation proceedings.[9] No clear legal authority exists preventing the sale or dissemination of user data by data brokers to the federal government.

47. The New York Times reported on February 13, 2026, "Homeland Security is said to have sent Google and Meta hundreds of subpoenas for information to identify Americans who oppose ICE. Tech companies received legal requests for the names, email addresses, telephone numbers and other identifying data behind social media accounts that track or criticize the agency."[10]

48. In early March 2026, a news website reported about the existence of a U.S. Department of Homeland Security internal document revealing that Custom and Border Protection "bought data from the online advertising ecosystem to track peoples' precise movements over time …"[11]

---

[8] https://www.nbcnews.com/tech/tech-news/facebook-turned-chat-messages-mother-daughter-now-charged-abortion-rcna42185 (last visited 5/8/2026).

[9] https://newrepublic.com/post/206088/homeland-security-67-year-old-us-citizen-criticized-email (last visited 5/8/2026).

[10] *Homeland Security Wants Social Media Sites to Expose Anti-ICE Accounts* (N.Y. Times Feb. 13, 2026), available at https://www.nytimes.com/2026/02/13/technology/dhs-anti-ice-social-media.html (last visited 5/8/2026).

[11] *CBP Tapped Into the Online Advertising Ecosystem To Track Peoples' Movements* (404 Media Mar. 3, 2026), available at https://www.404media.co/cbp-tapped-into-the-online-advertising-ecosystem-to-track-peoples-movements/ (last visited 5/8/2026); *see also Security News This Week: CBP Used Online Ad Data to Track Phone Locations* (Wired Mar. 7, 2026),

**Data and Related Profiles of Consumers Have Economic Value**

49. The type of visitor data transmitted via the Website to NextRoll has economic value – as is obvious from the facts that data brokers like NextRoll have created code to collect it, and that Juice Press has installed the code on the Website. The value of this data – that of Plaintiff as well as that of members of the Class on whose behalf Plaintiff has filed this action – was diminished by Juice Press's deployment of the NextRoll code on the Website.

50. The loss of anonymity that occurs through the type of visitor browser fingerprinting and subsequent tracking alleged herein imposes real costs on visitors to Juice Press's Website, including Plaintiff and members of the putative Class in this action. For example, in 2025, the Federal Trade Commission found that many websites use data such as "consumers' characteristics and behaviors, like location, demographics, browsing patterns and shopping history" to tailor consumer pricing.[12]

51. As recently explained by the Law Institute:[13]

> In the modern economy, identity information has been described as the business of buying and selling information as a commodity. Unlike traditional physical commodities, personal data is intangible yet holds immense economic value. The transformation of identity into a tradeable asset has occurred gradually as technologies for collecting and analyzing personal information have become increasingly sophisticated. [ . . . ] Personal identity in the digital realm comprises multiple elements. Demographic information includes age, gender, location, income levels, and educational background. Behavioral data tracks online activities such as websites visited, products viewed, and time spent on particular pages. Transaction histories reveal purchasing patterns, payment methods, and brand preferences. Location data from smartphones and wearable devices provides real-time information about

available at https://www.wired.com/story/cbp-used-online-ad-data-to-track-phone-locations/ (last visited 5/8/2026).

[12] *See* https://www.ftc.gov/news-events/news/press-releases/2025/01/ftc-surveillance-pricing-study-indicates-wide-range-personal-data-used-set-individualized-consumer (U.S. Federal Trade Commission Jan. 17, 2025) (last visited 5/8/2026).

[13] https://thelaw.institute/cyberspace-technology-and-social-issues/identity-value-modern-economy/ (The Law Institute (Updated) Oct. 27, 2025) (last visited 5/8/2026).

> movements and habits. What makes identity information particularly valuable is its predictive power. By analyzing past behaviors and preferences, companies can anticipate future actions with remarkable accuracy. This ability to forecast consumer behavior translates directly into competitive advantages in marketing and product development. A complex ecosystem has emerged around the collection and trading of identity information. This marketplace operates largely invisibly to average consumers, yet it powers much of the modern digital economy. The global data brokerage industry was valued at approximately $270.4 billion in 2024, with projections indicating growth to $473.35 billion by 2032. [ . . . ] Advertisers and marketers purchase identity information to target specific consumer segments with tailored messages. Behavioral advertising uses internet cookies and tracking technologies to understand browsing tendencies and create defined audience segments. This allows companies to place advertisements in front of consumers most likely to respond positively.

52. There exists an established market for the type of personal data collected and transmitted through the NextRoll code running on the Website: data that facilitates the creation and enhancement of consumer profiles for individuals, and ongoing tracking of individuals' internet browsing. Juice Press's surreptitious and unlawful transfer of personal information through the code on its Website diminished Plaintiff's and Class members' ability to participate in that market on informed terms, including to exercise the choice of whether to withhold, limit, or exchange their personal data for value.

**Injuries Caused By Juice Press's Use of the NextRoll Code**

53. Juice Press's installation and use of the NextRoll code on the Website has caused, and continues to cause, injury to Plaintiff, and other similarly situated visitors, in concrete ways: Plaintiff's communications with the Website were converted into a linkable identity record without Plaintiff's consent; Plaintiff lost control over how the extracted visitor-identifying signals are used and disseminated; and Plaintiff faces an ongoing risk that this unlawfully created identity linkage will be repurposed, shared, or sold within the data-broker ecosystem for uses far removed from Plaintiff's purpose in visiting the Website. Further, it diminished the value to Plaintiff (and other similarly situated visitors) of data associated with them, their device and their browser that can be used to identify and track them.

54. Juice Press's deployment of the NextRoll code intentionally interfered with Plaintiff's private affairs – and those of members of the putative Class – in a manner a reasonable person would find highly offensive. It transformed what Plaintiff and the members believed was an anonymous visit to the Website to the disclosure of their identity and the initiation of ongoing internet tracking, enabling NextRoll to inundate them with unwanted targeted marketing and possible sale of their data.

55. The disclosure to NextRoll itself, made without consent and for the purposes of identity matching and monetization, constitutes an invasion of privacy because it attributes personal browsing activity to a visitor's identity profile and exports it outside the consumer-website relationship.

## CLASS ALLEGATIONS

56. Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class") defined as follows:

> **All persons who, while located in California, visited the Website during the applicable limitations period, and were subjected to the operation of the NextRoll code running on the Website.**

57. This action has been brought and may be properly maintained as a class action. There is a well-defined community of interest in the litigation and the proposed class is ascertainable.

58. NUMEROSITY: Plaintiff does not know the number of Class members but believes the number to be in the thousands, if not more. The exact identities of Class members may be ascertained by the records maintained by Juice Press.

59. COMMONALITY: Common questions of fact and law exist as to all Class members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the individual circumstances of any Class member, include but are not limited to the following:

a. Whether Juice Press's actions violate California common or statutory law;

b. Whether Plaintiff and Class members are entitled to statutory damages;

c. Whether Plaintiff and Class members are entitled to punitive damages;

d. Whether Plaintiff and Class members are entitled to injunctive relief;

e. Whether Plaintiff and Class members are entitled to the disgorgement of unlawfully obtained data; and

f. Whether Plaintiff and Class members are entitled to the disgorgement of profits.

60. TYPICALITY: Plaintiff was subjected to the NextRoll code running on the Website when she visited the Website on July 17, 2025. As a result, her data was transmitted to NextRoll, and possibly other third parties, for fingerprinting and tracking purposes, and for possible sale by NextRoll. Her claims are therefore typical of the Class.

61. ADEQUACY: Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in the class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the class or whose inclusion would otherwise be improper are excluded.

62. SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of each Class member is impracticable and inefficient. Even if every Class member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed and address identical issues.

## FIRST CAUSE OF ACTION

### Violations of California Trap and Trace Law, Cal. Penal Code § 638.51

63. Plaintiff and Class members reallege and incorporate each allegation in all preceding paragraphs contained herein.

64. The California Trap and Trace Law provides that "a person may not install or use…a trap and trace device without first obtaining a court order…." Cal. Penal Code § 638.51(a).

65. A "trap and trace device" is defined as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing,

addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." § 638.50(c).

66. Each of the NextRoll code, as deployed on the Website, constitutes a trap and trace device under Cal. Penal Code § 638.50(c).

67. The "electronic communication" at issue in this case is the communication between the devices of Plaintiff and the Class members, on the one hand, and the Website, an instrumentality of Juice Press, on the other hand. "Electronic communication" is defined under CIPA as "any transfer of signs, signals, writings, images, sounds, data, or intelligence of any nature in whole or in part by a wire, radio, electromagnetic, photoelectric, or photo-optical system." A visit to a website entails the transfer of signals and data, or "intelligence of any nature" by a "wire, radio [or] electromagnetic [ . . . ] system." Cal. Penal Code § 629.51(a)(2). The interactions of Plaintiff and Class members with the Website meet this definition.

68. Each of the NextRoll code is designed to identify *to a reasonably likely degree* the source of the electronic communications between the devices of Plaintiff and Class members, on the one hand, and the Website, on the other, by 'capturing' the electronic or other impulses emanating from the devices that are "incoming" to the Website. The "***sources***" of the electronic communications moving from the devices to the Website are ***Plaintiff and the Class members (including their devices)***.

69. Software or code running on websites that "captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication" constitutes a trap and trace device under §§ 638.50-51. *See, e.g., Alex & Ani, LLC*, 2026 U.S. Dist. LEXIS 11238, at *4-7 (C.D. Cal. Jan. 20, 2026); *Casillas v. Six Flags Ent. Corp.*, 2025 U.S. Dist. LEXIS 260100, at *21-22 (C.D. Cal. Dec. 15, 2025); *Lewis v. Magnite, Inc.*, 2025 U.S. Dist. LEXIS 263675, at *39-42 (C.D. Cal. Dec. 4, 2025); *Garon v. Keleops USA, Inc.*, 2025 U.S. Dist. LEXIS 170745, at *10-15 (N.D. Cal. Sep. 2, 2025); *Riganian v. NextRoll Holdings, Inc.*, 791 F.Supp.3d 1075, 1093-1094 (N.D. Cal. July 18, 2025); *Gabrielli v. Motorola Mobility LLC*, 2025 U.S. Dist. LEXIS 133836, at *30-32 (N.D. Cal. July 14, 2025); *Heiting v. Fka*

*Distrib. Co.*, 2025 U.S. Dist. LEXIS 20076, at *8 (C.D. Cal. Feb. 3, 2025); *Conohan v. Rad Power Bikes Inc.*, 2025 U.S. Dist. LEXIS 72865, 2025 WL 1111246, at *16 (C.D. Cal. Apr. 3, 2025); *Mirmalek v. Los Angeles Times Commc'ns LLC*, 2024 U.S. Dist. LEXIS 227378, at *6-10 (N.D. Cal. Dec. 12, 2024); *Shah v. Fandom, Inc.*, 754 F. Supp. 3d 924, 930-931 (N.D. Cal. October 21, 2024); *Moody v. C2 Educ. Sys. Inc.*, 742 F. Supp. 3d 1072, 1076-1077 (C.D. Cal. July 25, 2024).

70. Juice Press did not obtain a court order before using or installing the NextRoll code on the Website. Juice Press also did not obtain consent from Plaintiff or any of the Class members before using this technology, which is designed to reasonably likely identify Plaintiff and the Class members, along with their devices, as the source of electronic communications between them, on the one hand, and the Website, an instrumentality of Juice Press, on the other hand.

71. Juice Press obtained neither the express nor implied consent of Plaintiff or Class members to be subjected to the transmission of data about them and their devices to NextRoll for the purpose of identifying them as the source of their visits to the Website.

72. Juice Press is ineligible for the statutory consent exemption from liability for use of a trap and trace device set forth in Cal. Penal Code § 638.51(b)(5). The § 638.51(b)(5) consent exemption is available only to a "provider of electronic or wire communication service." Juice Press is not such a provider.

73. CIPA imposes civil liability including statutory damages for violations of the California Trap and Trace Law. Cal. Penal Code § 637.2; *see also Fandom,* 754 F. Supp. 3d at 932; *C2 Educ. Sys. Inc.*, 742 F. Supp. 3d at 1077-78.

74. Juice Press's installation of the NextRoll code on the Website, resulted in the transmission and possible sale of the personal information of Plaintiff and Class members to NextRoll (transmission), and possibly other third parties. This diminished the value of such information. Moreover, it injured the rights of Plaintiff and Class members to control the distribution of their personal information, and the ways in which that information has been used, and currently is being used, by third parties.

75. Plaintiff and Class members are entitled to statutory damages of $5,000 for the Juice Press's violations of § 638.51. They are also entitled to injunctive relief enjoining the conduct violating § 638.51.

## SECOND CAUSE OF ACTION

### Intrusion Upon Seclusion

76. Plaintiff and Class Members reallege and incorporate each allegation in all preceding paragraphs contained herein.

77. Under California law, a defendant is liable for intrusion upon seclusion when it intentionally intrudes into a private place, conversation, or matter in a manner that would be highly offensive to a reasonable person.

78. Plaintiff and Class Members maintain a reasonable expectation of privacy in the conduct of their lives, including their internet browsing activities and in their electronic communications and exchange of personal information. The reality of modern life increasingly requires that many of our necessary daily activities be conducted online. Plaintiff and Class members are unable to conduct their lives without engaging in substantial activity on the internet. This fact means that Plaintiff's and Class members' private lives are susceptible to observation and recording that can be used in ways that are comprehensive and highly intrusive - including the creation of profiles capturing their attributes, habits and behavioral patterns. If Plaintiff and Class Members cannot maintain a reasonable expectation of privacy in the conducting of their daily affairs online, and in the digital transmission of their personal information, they can have no such expectation for other facets of their lives.

79. Juice Press's deployment of NextRoll code on the Website intentionally intruded into a private conversation or matter Plaintiff and the Class members were involved in – namely their visit to the Website. The intrusion allowed NextRoll to identify, profile and track (on an ongoing basis) Plaintiff and Class members. Use of the NextRoll code violates Plaintiff's and Class members' reasonable expectation of privacy, intercepting, collecting, tracking, and compiling their internet browsing and communications, and making that data available for sale.

80. Plaintiff and the Class members never authorized the third-party cookies and other tracking technology initiated by the NextRoll code on the Website.

81. Plaintiff and Class members had an objectively reasonable expectation of privacy with respect to their conversation or exchange with Juice Press over the Website.

82. Juice Press's intrusion into Plaintiff's and Class members' visits to the Website was intentional, in that it involved deployment of software and configuration of the Website. Further, it was perpetrated for Juice Press's economic benefit.

83. The intrusion described herein would be highly offensive to a reasonable person and constitutes an egregious breach of social norms. Data brokers like NextRoll engage in a dragnet-style collection and interception of individuals' online activities. They are in the business of creating comprehensive "cradle to grave" profiles on individuals that incorporates both an individual's online activities and offline information. The electronic information gathered by data brokers like NextRoll reflects highly personal aspects of individuals' lives, and can be used for purposes as political or healthcare advertising – thereby intruding on aspects of individuals' lives that are considered highly personal and confidential. Moreover, Juice Press and NextRoll have violated California statutes designed to protect the privacy rights of California citizens.

84. Juice Press's invasion of the privacy of Plaintiff and Class members damaged them and they are therefore entitled to compensatory damages, which includes monetary damages.

85. Plaintiff and Class members are entitled additionally to punitive damages because Juice Press's use of the NextRoll code on the Website was malicious, oppressive and willful. That use includes both the installation of the code and the configuration of the Website to bypass what Plaintiff and the Class members believed were their decisions to stop all data-sharing and data-selling by the Website. Juice Press's actions were made in conscious disregard of the choice made by Plaintiff and the Class members to stop the sharing with and selling to third parties of their personal data.

86. Plaintiff and Class members are entitled additionally to equitable relief in the form of enjoining Juice Press from continuing to engage in its unlawful conduct, and disgorgement of profits earned by Juice Press from its invasion of their privacy interests.

## PRAYER

WHEREFORE, Plaintiff, on her behalf and on behalf of the Class members, prays for the following relief against Defendants:

1. An order certifying the Class, naming Plaintiff as the representative of the Class and appointing Plaintiff's attorneys as Class Counsel;
2. An award of statutory damages pursuant to CIPA;
3. An award of punitive damages;
4. An award of nominal damages;
5. An order for full restitution;
6. An order requiring Defendants to disgorge revenues and profits wrongfully obtained;
7. An order enjoining Defendants' conduct as alleged herein and any other injunctive relief that the Court finds proper;
8. Reasonable attorneys' fees and costs; and
9. All other relief that would be just and proper as a matter of law or equity, as determined by the Court.

DATED: July 13, 2026

TAULER SMITH LLP

By: */s/ J. Evan Shapiro*
J. Evan Shapiro

J. Evan Shapiro
Robert Tauler
90 Broad St., Suite 703
New York, New York 10004
eshapiro@taulersmith.com
rtauler@taulersmith.com
(212) 702-8670 (New York office)
(213) 927-9270 (Main Office (L.A.))

*Attorneys for Plaintiff Ekaterina Loshkareva*

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury.

DATED: July 13, 2026

TAULER SMITH LLP

By: *<u>/s/ J. Evan Shapiro</u>*
J. Evan Shapiro

J. Evan Shapiro
Robert Tauler
90 Broad St., Suite 703
New York, New York 10004
eshapiro@taulersmith.com
rtauler@taulersmith.com
(212) 702-8670 (New York office)
(213) 927-9270 (Main Office (L.A.))

*Attorneys for Plaintiff Ekaterina Loshkareva*